UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | |
|---|---|
| IN RE:<br><br>**CLEAN BURN FUELS, LLC**<br><br>Debtor | Case No. 11-80562<br>Chapter 11 |
| **Motion For Authority To Use Cash Collateral** ||

NOW COMES Clean Burn Fuels, LLC (the "Debtor") and moves the Court pursuant to §363 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure as follows:

1. On April 3, 2011 (the "Petition Date"), the Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code. The Debtor continues in possession of its assets and operates its businesses as a debtor-in-possession.

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, and this matter is a core proceeding under 28 U.S.C. §157(b)(2). Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.

## BACKGROUND

3. The Debtor is in the business of producing and selling ethanol, a clean-burning, high-octane fuel that is produced from renewable sources with corn being the key ingredient. The ethanol is blended with unleaded gasoline, with the most common gasoline blend consisting of 10% ethanol and 90% unleaded gasoline. The ethanol-blended gasoline can be used in all vehicles, and is beneficial because it is less costly, has a higher octane rating, and produces fewer harmful emissions.

4. The Debtor also produces and sells dried distillers grains with solubles ("DDGS"), one of two co-products created during the ethanol production process that is used by farmers as livestock and poultry feed. Carbon dioxide, the other co-product, could also be compressed into liquid form and sold by the Debtor.

5. The Debtor, a North Carolina limited liability company founded in 2005, is the first company to produce ethanol in North Carolina. The Debtor completed the construction of its ethanol plant ("Plant") in August of 2010 and started producing and selling ethanol and

DDGS shortly thereafter. The Plant, which is located in Raeford, North Carolina, has the capacity to produce up to 60 million gallons of ethanol per year, with potential room for expansion to 240 million gallons per year.

6. Soon after the Debtor began operations, the Chicago Board of Trade ("CBOT") price of corn began to rise dramatically. By the end of February 2011, the price of corn had effectively doubled from approximately $3.60 per bushel in the summer of 2010 to $7.20 per bushel. The price of ethanol and DDGS however did not rise resulting in significant losses for the Debtor. As a result, the Debtor stopped purchasing corn on February 28, 2011 and shut down the Plant. The Debtor expects to resume operations in late summer of 2011 when the price of corn is expected to drop to a level that will allow the Debtor to be profitable.

## SECURED LENDER

7. In conjunction with the acquisition and construction of the Plant, on March 31, 2008, the Debtor and Cape Fear Farm Credit, for itself and/or as agent/nominee for other lending institutions ("Lender"), entered into a Credit Agreement whereby Lender agreed to (i) lend to the Debtor up to $63,000,000 in term loans for the construction of the Plant, and (ii) provide the Debtor with a $6,000,000 revolving line of credit. The Debtor and Lender also entered into seven separate amendments to the Credit Agreement between November of 2008 and August of 2010 (the Credit Agreement, along with the seven amendments, collectively referred to as the "Credit Agreement").

8. Pursuant to the Credit Agreement, the Debtor executed the following documents in favor of Lender: (i) a Construction/Term Loan Note in the principal amount of $10,000,000, (ii) a Construction/Term Loan Note in the principal amount of $25,000,000, (iii) a Construction/Term Loan Note in the principal amount of $28,000,000 (the three Construction/Term Loan Notes collectively referred to as the "Term Notes"), (iv) a Revolving Line of Credit Note in the principal amount of $6,000,000 (the "RLOC Note"), (v) a Deed of Trust, Security Agreement, and Assignment of Leases, Rents, and Occupancy Agreements as security for the obligations under Term Notes and the RLOC Note ("Deed of Trust"), (vi) a Security Agreement as security for the obligations under Term Notes and the RLOC Note ("Security Agreement" and together with the Credit Agreement, Term Notes, RLOC Note, and Deed of Trust, the "Loan Documents").

9. Pursuant to the Loan Documents, Lender is owed approximately $66,006,639 plus interest and fees accrued as of the Petition Date secured by a first mortgage lien on the Plant and a security interest in other assets of the Debtor, including equipment, inventory, accounts, deposit accounts, general intangibles and the proceeds thereof.

10. As of the Petition Date, there are other lien claims filed against the Plant by contractors or subcontractors (the "Lien Claimants") who supplied materials and/or labor for the purpose of constructing the improvements located on and thus an affixed part of the Plant. Upon information and belief, the inchoate lien rights of the Lien Claimants are unliquidated, of unknown and uncertain priority, and junior to the liens of Lender. All such liens are also disputed except for the claim of Uretek.

11. On or about October 3, 2007, the Plant was appraised for the Lender on a pre-construction basis for $110,000,000. As of the Petition Date, the Debtor does not know the present fair market value of the Plant, which may be worth more or less than the amount owed to the Lender. Based on a production capacity of 60 million gallons of ethanol, the Debtor has estimated the value of the Plant at $72,000,000.

12. The Debtor does not presently dispute the extent, validity or priority of the lien and security interest held by the Lender, except as provided below. The Debtor disputes all but one of the liens filed by the Lien Claimants. However, the Debtor reserves for itself, any Committee of Unsecured Creditors subsequently created, and any trustee subsequently appointed, any and all rights to challenge, avoid, object to, set aside or subordinate any claims, liens, security interests or rights of setoff against the Plant or other property of the Debtor.

13. As of the Petition Date, the Debtor has no ethanol inventory and no DDGS inventory of any substantial amount remaining at the Plant, but has funds on deposit at Branch Banking & Trust Company, Capital Bank and Gateway Bank ("Deposit Accounts") and two certificates of deposit at Capital Bank ("Certificates of Deposit"). The Lender may assert a security interest in the Deposit Accounts and Certificates of Deposit pursuant to the Loan Documents.

14. As of the Petition Date, the Debtor (as a debtor-in-possession) has the rights and powers of, and may avoid any transfer of property of the Debtor or any obligation incurred by the Debtor that is avoidable by a hypothetical lien creditor, as more particularly set forth in § 544 of the Bankruptcy Code. The Lender does not have a perfected security interest in the Deposit

Accounts as of the Petition Date. The Debtor contends that the Lender's security interest in Deposit Accounts is therefore subordinate to the Debtor's position as a hypothetical lien creditor on the Petition Date.

15. To the extent BB&T has a valid, properly perfected security interest in the Deposit Accounts and/or the Certificates of Deposit that is superior to the rights and interests of the Debtor as a hypothetical lien creditor, then the Deposit Accounts and/or Certificates of Deposit would constitute "cash collateral" as that term is defined in the Bankruptcy Code, the use of which is subject to the restrictions set forth in § 363.

## **RELIEF REQUESTED**

16. The Debtor is dependent upon use of the cash collateral to pay on-going costs of insuring, preserving, repairing and protecting the Plant until operations can resume in late summer of 2011. The Debtor thus has an immediate need for the use of cash collateral. If not permitted to use the cash collateral to pay these expenses, reorganization would be rendered impossible and the fair market value of the Plant will be significantly reduced, resulting in financial loss to the Lender and all parties in interest. To that end, the Debtor requests the Court to authorize the use of cash collateral as set forth herein.

17. An order granting interim relief substantially in the form attached, followed by a final hearing at some future date selected by the Court, would not prejudice the rights of the Lender, as (i) the Lender would continue to maintain the existing liens on the Plant, and (ii) the use of cash collateral would preserve the value of the estate for the Lender, the Lien Claimants and all other creditors.

18. The Debtor offers to provide the Lender with adequate protection as follows:

    a. The cash collateral shall be disbursed in payment of costs and expenses as shown in the Budget attached to the Interim Order as Exhibit A or as may otherwise be approved by the Lender, or by the Court after further notice and hearing, as follows:

        i. The costs of operating and preserving the Plant.

        ii. Payment of the Chapter 11 quarterly fees.

        iii. Payment of allowed fees and expenses of Debtor's bankruptcy counsel, special counsel, expert witnesses, and other professionals, after any prepetition retainers have been exhausted.

b. Providing the Lender with a continuing post-petition lien and security interest in all property and categories of property of the Debtor in which and of the same priority as said creditor held a similar, unavoidable lien as of the Petition Date, and the proceeds thereof, whether acquired pre-petition or post-petition (the "Post-petition Collateral"), equivalent to a lien granted under §§ 364(c)(2) and (3) of the Bankruptcy Code, but only to the extent of cash collateral used.

    i. The validity, enforceability, and perfection of the aforesaid post-petition liens on the Post-petition Collateral shall not depend upon filing, recordation, or any other act required under applicable state or federal law, rule, or regulation.

    ii. If the Lender hereafter requests the Debtor to execute and deliver financing statements or other such instruments or documents reasonably considered by said creditor to be necessary or desirable to further evidence the perfection of liens and security interest herein granted, the Debtor would be authorized and directed to execute and deliver such financing statements, instruments, and documents to Lender without further notice, hearing, or order.

c. Providing the Lender with an administrative expense claim to the extent the use of cash collateral, after application of the proceeds of the replacement collateral, results in a decrease in the value of such entity's interest in such property.

d. Providing the Lender (and the Bankruptcy Administrator) with financial reports for the Debtor in form and frequency reasonably acceptable to the Lender and the Bankruptcy Administrator.

e. Notwithstanding the lien therein granted to the Lender to secure the Debtor's use of its cash collateral, such creditor shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner/operator" with respect to the operation or management of the Debtor solely by virtue of any terms or conditions of the Order.

19. The Debtor seeks authority to use cash collateral through and including the effective date of a confirmed plan of reorganization, a sale of substantially all assets of the estate,

or the conversion of this case to Chapter 7, whichever may first occur; provided, however, without further notice and hearing the Debtor may not use cash collateral for any purpose other than operations in the ordinary course of business or the payment of allowed administrative fees, costs, or expenses, irrespective of whether such purpose would be proper under applicable law.

20. Notwithstanding any suspension or termination of the right to use Cash Collateral as set forth above (a "Termination Date"), the Debtor shall be permitted to carve out from Cash Collateral or any replacement collateral and use, and the collateral of Lender shall be subject to the Debtor's right to recover under Section 506(c) of the Bankruptcy Code, an aggregate amount necessary to pay all Permitted Trailing Expenses. As used herein, the term "Permitted Trailing Expenses" shall mean, on the Termination Date, the following expenses to the extent incurred post-petition and prior to such Termination Date but in the aggregate amount not to exceed one hundred ten percent (110%) of the aggregate expenditures set forth in the Budget through such Termination Date:

  a. The costs of operating and preserving the estate.

  b. Quarterly fees pursuant to 28 U.S.C. § 1930(a)(7).

  c. Professional fees and expenses (including expert witness fees and expenses) for professionals for the Debtor after application of any prepetition retainers, and for professionals for the Committee if one is duly formed, after any prepetition retainers have been exhausted.

21. The Debtor proposes that to the extent that the Lender has any objection to any of the items paid or provided for as set forth in the monthly reports or other reports of operations filed or furnished to said creditor, or objects to a proposed budget or to a specific manner in which cash collateral is being used, then said creditor may, upon ten (10) days notice to the Debtor and opportunity to cure: (i) seek an order of the Bankruptcy Court restraining such payments or usage as not being in conformity with this Motion; or (ii) seek an Order terminating further authority to use cash collateral altogether.

22. The Debtor seeks the consent of the Lender to the use of cash collateral for the purposes set forth in this Motion. In the absence of such consent, if not forthcoming, the Debtor asks the Court to authorize such use and to provide adequate protection to the Lender to the extent the use of cash collateral impairs the Lender's interest, in a manner and to the extent to be determined by the Court at the hearing on this Motion.

Wherefore, the Debtor prays the Court for the following relief:

1. That an interim order in the form attached hereto be entered by this Court after notice and interim hearing (i) authorizing the Debtor to use cash collateral in an amount to be determined at the interim hearing based upon the proposed budget attached hereto, and (ii) providing the Lender with adequate protection as set forth herein.

2. That a final hearing be held regarding this motion, the interim order, and the Debtor's request for a final order, after providing such notice as is required by Rule 4001 of the Federal Rules of Bankruptcy Procedure.

3. Such other relief as the Court may deem necessary and proper.

RESPECTFULLY submitted on behalf of the Debtor, this the 4th day of April, 2011.

/s/ John A. Northen

**Counsel for the Debtor:**
John A. Northen, NCSB #6789
jan@nbfirm.com
Vicki L. Parrott, NCSB #25449
vlp@nbfirm.com
Northen Blue, LLP
Post Office Box 2208
Chapel Hill, NC 27515-2208
Telephone: 919-968-4441