UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

In re:                                   )
                                         )
CLEAN BURN FUELS, LLC,                   )      Case No. 11-80562
                                         )      Chapter 11
                                         )
             Debtor.                     )

**OBJECTION OF CAPE FEAR FARM CREDIT, ACA, FOR ITSELF
AND AS AGENT/NOMINEE FOR OTHER LENDING INSTITUTIONS
UNDER A CERTAIN CREDIT AGREEMENT, TO DEBTOR'S
MOTION FOR AUTHORITY TO USE CASH COLLATERAL**

Cape Fear Farm Credit, ACA, for itself and as agent/nominee for other lending institutions (collectively, "Lender") under a certain Credit Agreement with Clean Burn Fuels, LLC ("Debtor"), hereby objects to the Debtor's Motion for Authority to Use Cash Collateral (the "Motion") [Doc #14] filed by Debtor on April 4, 2011. In the Motion, Debtor seeks authorization to use funds on deposit in accounts Debtor has with Branch Banking & Trust Company, Capital Bank and Gateway Bank (the "Deposit Accounts") and two certificates of deposit at Capital Bank (the "Certificates of Deposit", and, collectively with the Deposit Accounts, the "Cash Collateral"). Lender asserts that it holds a properly perfected security interest in all of the Cash Collateral. Lender objects to Debtor's proposed use of the Cash Collateral on the grounds that Lender's interest in the Cash Collateral and as a secured creditor is not adequately protected, and such proposed use will dissipate the collateral securing Lender, resulting in a diminution of its secured position.

## SUMMARY OF FACTUAL BACKGROUND

The facts in this matter are summarized as follows:

### A. The Secured Loans Made by Lender

1. As noted in the Motion, on March 31, 2008, Debtor and Lender entered into that certain Credit Agreement (as amended, the "Credit Agreement") under which Lender agreed to make three term loans to Debtor in the aggregate original principal amount of $63,000,000.00 for, *inter alia*, the construction of Debtor's ethanol plant, and to make a revolving line of credit loan to Debtor in the maximum principal amount of $6,000,000.00. In connection with these loans, the following documents (collectively, the "Loan Documents") were executed and, where appropriate for perfection of security interests and liens, filed with appropriate recording offices:

    (a) Credit Agreement dated as of March 31, 2008 by and between Clean Burn Fuels, LLC, as Borrower (the "Debtor"), and Cape Fear Farm Credit, ACA, for itself and as agent/nominee for other lenders with an interest in the Loans (as defined therein), as Lender (the "Lender");

        (i) First Amendment to Credit Agreement entered into on November 11, 2008, by and between the Debtor and the Lender;

        (ii) Second Amendment to Credit Agreement entered into on March 4, Third Amendment to Credit Agreement entered into on June 26, 2009, by and between the Debtor and the Lender;

        (iii) Fourth Amendment to Credit Agreement entered into on December 3, 2009, by and between the Debtor and the Lender;

        (iv) Fifth Amendment to Credit Agreement entered into on April 26, 2010, by and between the Debtor and the Lender;

        (v) Sixth Amendment to Credit Agreement entered into on July 2, 2010, by and between the Debtor and Lender;

        (vi) Seventh Amendment to Credit Agreement entered into on October 29, 2010, by and between the Debtor and the Lender;

(b) Construction/Term Loan Note dated March 31, 2008 from the Debtor to the Lender, for Loan Number 020-090-743450-01, in the original principal amount of $25,000,000.00;

    (i) Construction/Term Loan Note Modification Agreement No. 1 dated April 26, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-01, in the original principal amount of $25,000,000.00;

    (ii) Construction/Term Loan Note Modification Agreement No. 2 dated October 29, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-01, in the original principal amount of $25,000,000.00;

(c) Construction/Term Loan Note dated March 31, 2008 from the Debtor to the Lender, for Loan Number 020-090-743450-02, in the original principal amount of $10,000,000.00;

    (i) Construction/Term Loan Note Modification Agreement No. 1 dated April 26, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-02 in the original principal amount of $10,000,000.00;

    (ii) Construction/Term Loan Note Modification Agreement No. 2 dated October 29, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-02 in the original principal amount of $10,000,000.00;

(d) Construction/Term Loan Note dated March 31, 2008 from the Debtor to the Lender, for Loan Number 020-090-743450-03, in the original principal amount of $28,000,000.00;

    (i) Construction/Term Loan Note Modification Agreement No. 1 dated April 26, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-03 in the original principal amount of $28,000,000.00;

    (ii) Construction/Term Loan Note Modification Agreement No. 2 dated October 29, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-03 in the original principal amount of $28,000,000.00;

(e) RLOC Note dated March 31, 2008 from the Debtor to Lender, for Loan Number 020-090-743450-04, in the original principal amount of $6,000,000.00;

(i) RLOC Note Modification Agreement No. 1 dated April 26, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-04 in the original principal amount of $6,000,000.00;

(ii) RLOC Note Modification Agreement No. 2 dated October 29, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-04 in the original principal amount of $6,000,000.00;

(f) Deed of Trust, Security Agreement and Assignment of Leases, Rents and Occupancy Agreements dated March 31, 2008 from the Debtor in favor of Lender, filed with the Hoke County, North Carolina Register of Deeds on March 31, 2008 in Book 801 at pages 287-303, designated on such filing as Instrument # 02111;

(g) Security Agreement dated March 31, 2008 by and between the Debtor and Lender;

(h) UCC-1 Financing Statement filed by Lender with the North Carolina Secretary of State on April 9, 2008, designated on such filing as File No. 20080033438B;

(i) UCC-1 Financing Statement filed by Lender with the Hoke County, North Carolina Register of Deeds on March 31, 2008, in Book 801 at pages 304-309, designated in such filing as Instrument # 02112;

(j) Assignment of Construction Documents dated March 31, 2008 from the Debtor in favor of Lender;

(k) Subordination and Standstill Agreement dated as of November 15, 2008, by and between Lender, as the Lender under certain loans to the Debtor, and Clifford E. Bullard, Jr., Philip Kohl, George M. Brannon, Lee-Moore Capital Company (by Kirk J. Bradley, its President), Greg Brown and Jack Carlisle, and acknowledged by the Debtor;

(l) Contractor Guaranty and Reimbursement Agreement entered into and effective on July 2, 2010, by and among Jack J. Carlisle, Lender, and the Debtor;

(m) <u>Limited Guaranty</u> dated April 23, 2010 by and among Capitol Broadcasting Company, Inc., as Guarantor, the Lender, and the Debtor;

(n) <u>Limited Guaranty</u> dated April 26, 2010 by and among Lee-Moore Capital Company, as Guarantor, the Lender, and the Debtor;

(o) <u>Limited Guaranty</u> dated April 26, 2010 by and among Jack J. Carlisle, as Guarantor, the Lender, and the Debtor;

(p) <u>Limited Guaranty</u> dated April 26, 2010 by and among Anna Ho, as Guarantor, the Lender, and the Debtor; and

(q) <u>Limited Guaranty</u> dated April 26, 2010 by and among Phillip H. Kohl, as Guarantor, the Lender, and the Debtor;

2. Pursuant to the Credit Agreement, the Deed of Trust, Security Agreement and Assignment of Leases, Rents and Occupancy Agreements, and the Security Agreement, Debtor granted to Lender a security interest in, assignment of and lien on all, or substantially all, of Debtor's assets. The security interests and liens were perfected by recordation of the Deed of Trust, Security Agreement and Assignment of Leases, Rents and Occupancy Agreements with the Hoke County, North Carolina Register of Deeds, and by the filing of the UCC Financing Statements with the North Carolina Secretary of State and with the Hoke County, North Carolina Register of Deeds.

3. Among other items and types of property, and as appears most pertinent to the Motion, Lender's security interest and lien covers inventory, accounts receivable and general intangibles, and the proceeds of any of them (and of all other collateral securing Lender).

4. Debtor defaulted under the terms of the Credit Agreement and the Loan Documents, and on March 10, 2011, Lender provided notice of the default to Debtor in accordance with the provisions of the Loan Documents.

5. The aggregate principal balance due under the two Construction/Term Notes is $62,160,247.00, and the principal balance due under the RLOC Note is $3,660,000.00. The aggregate principal amount owed under all three loans is $65,820,247.00.

6. Lender is informed and believes that the funds in the Deposit Accounts consist solely of proceeds of Lender's collateral, such as collected accounts receivable and/or sale proceeds of inventory securing Lender. Accordingly, Lender is informed and believes that it possesses a perfected security interest in all of the Cash Collateral.

### B. Background of the Plant

7. Debtor's principal asset is a dry corn-to-ethanol plan located just outside of Raeford, North Carolina (the "Project"). The Project was designed to produce 166,000 gallons of ethanol per day. This level of production is referred to as the "Nameplate."

8. The Project has encountered significant, repeated, and unusual delays in its construction and development. While it is not uncommon to have delays in the construction and development of ethanol plants, it is uncommon for such delays to take more than 90 days after the initial date for scheduled full production. As of the date of this objection, the Project has been in start-up for over 250 days, and Debtor now is in the process of idling the facility with no concept for how Debtor might choose to move forward, if at all. In fact, Debtor does not know whether it will attempt a sale of the Project, attempt to re-start the Project and reorganize, abandon the Project to the Lender, or take some other as yet unarticulated course.

9. The Project first ground corn on August 13, 2010. Since that time, Debtor has unsuccessfully attempted to reach Nameplate. Debtor reported to Lender that it reached Nameplate for approximately three (3) days, but then a burner failure in the dryers caused one of the dryers to shut down and limit production. These issues with the dryers are ongoing, more severe than dryer issues at other plants, and Debtor has not identified any solution, nor has it determined any source of funding to replace the dryers that Lender understands Debtor now contends are defective.

10. The dryers are not the only problems preventing the Debtor from reaching Nameplate and fully permitted operations. In addition to the problems with the dryers, the Project has encountered the following deficiencies:

    (a)     Safety Issues. Debtor was delayed in installing proper safety equipment in areas where chemicals are stored. Debtor has resolved some of these issues, but Lender is informed and believes that there are remaining safety issues to be addressed to comply with OSHA requirements.

    (b)     Grain Bins. The grain silos experienced settling, which caused the foundations to crack. Debtor has attempted a repair on the west silo, and is in the process of determining the success of that repair. Unfortunately, there has been some evidence of further minor settling after the repair. The repairs on the east silo have been postponed pending the results of the attempted repair on the west silo.

    (c)     Pump Seals. A number of pump seals have failed, causing a number of leaks around the plant. It is unusual for a plant to have as many severe pump seal issues as have occurred at the Project.

    (d)     Contact Water. The leaks from the pump seals could cause a potential violation of the Project's NPDES waste water discharge permit.

    (e)     Boiler Blowdown. There appears to be a discharge of boiler blowdown (waste water discharge) into a drainage ditch, which could be a further violation of the NPDES permit.

    (f)     Fermentation Wash Tank and CIP Tank Collapse. The Fermentation Wash Tank and CIP Tank for the Project collapsed, caused by the lack of a relief valve on the top of the tank and potentially also partially by faulty

operation of the plant by personnel. Debtor has indicated that it only can use these tanks on a very limited basis due to the damages.

(g) Emissions Testing. The Project attained First Grind on August 13, 2010. Debtor has 180 days from initial operation to successfully complete testing to show compliance with the Air Permit. The Project has not met Nameplate, and now has been placed in idle mode. Lender is informed by Debtor that NCDENR has extended the testing deadline by 90 days. The shut down will cause this period to be exceeded.

(h) Boiler Explosion. On November 16, 2010, Debtor reported that it had experienced an explosion in one of the boilers on November 4, 2010. The cause of the explosion still is unknown. While Debtor has suggested a cause, the true cause has not been determined.

(i) Spare Parts. Debtor has a significant shortage of spare parts to ensure operations.

11. Debtor has conceded to this Court at the initial hearing on this Motion that the Project cannot be profitable if the price of corn does not return to previous levels, a commodity speculation that is doubtful under the current market forecasts.

12. Debtor stopped both purchasing corn and the production of products, shutting down its plant, in or about late February, 2011, as set forth in the Motion. Since that time, Debtor has been transitioning the plant to an "idle" state.

13. Given that Debtor has not been purchasing corn or producing new product since late February 2011, Debtor has not been replenishing its inventory, and as it has used, and now proposes to use, the funds it has collected from accounts receivable, Debtor has been diminishing the collateral securing Lender. Debtor's proposed continued use of the proceeds of Lender's collateral, comprising the Cash Collateral, would further diminish Lender's collateral and secured position.

**OBJECTIONS TO USE OF CASH COLLATERAL**

Lender objects to the use of Cash Collateral. Without limitation, Debtor has not met the requirements to use Cash Collateral upon the following bases:

**A. Debtor cannot provide adequate protection or the indubitable equivalent of any of Lender's Cash Collateral that Debtor expends in operations.**

Lender objects to Debtor's proposed use of the Cash Collateral on the grounds that Lender is not adequately protected for its interest in the Cash Collateral or as a secured creditor, and Debtor's proposed use of the Cash Collateral would cause Lender to suffer loss and a diminution of its collateral.

Even prior to placing the plant in idle, Debtor stated that it was operating at a loss of approximately $1.5 million per month.

While it is clear that Debtor carries the burden in demonstrating adequate protection, the cases are mixed on the standard of proof that the Debtor must meet. Compare, In re O.P. Held, Inc., 74 B.R. 777, 784 (Bankr. N.D.N.Y. 1987) (stating that "[w]hen requesting Court authorization for expenditure of cash collateral, a debtor must prove by clear and convincing evidence that the secured creditor will realize the value of its bargain in light of all the facts and circumstances of the case"); with In re Goode, 235 B.R. 584, 589 (Bankr. E.D. Tex. 1999) ("Thus, it becomes incumbent upon the Debtor in this case to prove by a preponderance of the evidence, as a prerequisite to its use of CNB's cash collateral, that CNB's interests are adequately protected."). Nevertheless, it does not matter which standard is applied in this case because Debtor cannot meet either.

Debtor's sole basis for asserting adequate protection is alleged equity in the plant based upon an admittedly out of date estimate of value, and which value was premised upon a permitted plant operating at Nameplate production. In contrast, this plant is not producing, and has never consistently produced, at Nameplate, never has obtained the requisite permits for full operations, and faces many expensive and significant issues with respect to such permitting.

**B. Lender objects to the extent that the Motion seeks to surcharge Lender's collateral for Debtor's general bankruptcy expenses and/or counsel fees.**

Section 506(c) will not allow a trustee to recoup "expenses which benefit the estate at large, but help secured creditors only indirectly." C.I.T. Corp. v. A&A Printing, Inc., 70 B.R. 878, 880 (M.D.N.C. 1987). Rather, the costs, fees and expenses incurred must provide a direct, specific and quantifiable benefit to the secured creditor and/or its collateral. In re Gluth Bros. Const., Inc., 424 B.R. 379, 399 (Bankr. N.D. Ill. 2009). The Debtor must affirmatively, rather than impliedly, demonstrate such direct and quantifiable benefits. In re K & L Lakeland Inc., 128 F.3d 203, 210 (4th Cir. 1997).

Expenses which benefit the entire estate "cannot be shifted from the debtor's estate to the secured creditors under the rubric of 'cost of preservation'" when such a benefit only incidentally affects the secured creditor. C.I.T. Corp., 70 B.R. at 880. Examples of such incidental benefits which do not fall under the purview of § 506(c) are rental expenses to store assets and litigation costs to fend of mechanic's liens. Id. The mere fact that a trustee has expended funds to keep a secured creditor's collateral "unharmed" is not enough to expose the creditor to § 506(c) liability. Id..

> "The general bankruptcy rule is that, absent an express agreement to the contrary, the expenses associated with administering a bankruptcy estate are not chargeable to a secured creditor's collateral or claim, but must be borne out of the unencumbered assets of the estate. The exception is stated in section 506(c), which permits the trustee to recover administrative expenses from a secured creditors' collateral if (i) the expenses are 'necessary' to preserve or dispose of the collateral, (ii) the expenses are 'reasonable,' and (iii) only to the extent of any 'benefit' to the secured creditor."

In re The Baer Group, Inc., 1997 W.L. 912291, *8 (Bankr. D. Md. 1997) (quoting 4 *Collier on Bankruptcy* ¶ 506.05 (15th ed. 1997)).

The reasonableness under § 506(c) should be compared to the amount of costs and expenses that the secured creditor would have expended foreclosing on the property. See, e.g., In re Felt Mfg. Co., Inc., 402 B.R. 502, 523 (Bankr. D. N.H. 2009).

The exception under § 506(c) allowing certain costs to be recovered from property securing an allowed claim is applicable "where the value of the property is greater than the sum of the claims secured by a lien on that property." Bankruptcy Service Lawyers Edition § 5:28, October 2010 (citing H.R. Rep. No. 95-595, p. 357; S. Rep. No. 95-989). Expenses and costs are "necessary" under § 506(c) "only if there is equity in the collateral for the benefit of the estate, and unnecessary if there is no equity." In re Ceron, 412 B.R. 41, 52 (Bankr. E.D.N.Y. 2009). In this case, Debtor cannot establish that the value of the Project exceeds Lender's claim.

Moreover, any provision for a carve-out from Lender's cash collateral for Debtor's attorney's fees constitutes an improper attempt to override 11 U.S.C. § 552, which continues Lender's lien in post-petition proceeds of its collateral. It is impermissible to use Lender's cash collateral for Debtor's counsel fees, as the only counsel fees that may be paid out of cash collateral are those which are necessary to preserve and protect the property subject to the creditor's interest. In re Morning Star Ranch Resorts, 64 B.R. 818, 822 (Bankr. D. Colo. 1986) (holding that a debtor is prohibited from utilizing cash collateral "to pay the ordinary costs of administering the bankruptcy estate, for those are expenses that are imposed upon the debtor and not upon the secured party").

Finally, Lender reserves the right to object to payment of counsel or the Chief Restructuring Officer ("CRO") fees from any retainer held by counsel for Debtor or Debtor's CRO to the extent that the retainer was paid from funds traceable to Lender's cash collateral. See In re Wilson Boulevard L.P., 206 B.R. 819, 823 (Bankr. E.D. Va. 1996).

### C. The budget projections, Debtor's lack of any idea how it might move forward without significant reliance upon unsupported commodity speculation, and the significant pre-petition operating losses all demonstrate that Debtor cannot propose a successful reorganization.

The budget shows no income beyond a single collection of an account receivable, which is insufficient even to cover interim idle expenses. Since Debtor has no idea whether it actually will be able to operate going forward, there is no projection demonstrating that Debtor will be able: (i) to confirm a plan in the face of the lien of Lender; (ii) comply with its obligation to make some debt service (which is not included in the budget); (iii) to cover the operating obligations and the costs of administration of a Chapter 11 case, and any further obligations of the business. While the debtor may get some benefit of the doubt at the beginning of a case, "when the debtor seeks usage of cash collateral, it is appropriate for the Bankruptcy Court to determine, even at the earliest stages of the case, whether there is any chance for a successful reorganization." 4 WILLIAM L. NORTON, JR., NORTON BANKRUPTCY LAW AND PRACTICE § 87:13, at n.27 (2nd ed. 2003).

### D. Debtor cannot use hopes of future profitability as adequate protection.

Debtor has never made a profit from operations, and, in fact, has operated at significant losses. Debtor cannot successfully contend that its future profits will provide adequate protection – especially where Debtor never has operated at any profit, and there is significant doubt that Debtor ever will operate at all. Operational profitability coupled with replacement liens in a revolving collateral pool will provide adequate protection in certain circumstances, provided that the Debtor (i) is able to demonstrate that such profitability can be sustained over the long term, (ii) is supported by realistic projections, and (iii) has some room for margin, whether by equity cushion or otherwise. E.g., In re Dynaco Corporation, 162 B.R. 389, 392-99 (Bankr. D.N.H. 1993). However, Debtor cannot meet any of these requirements.

In this case, Debtor has no margin whatsoever and no reliable equity cushion with a non-operating, incomplete, and defective Project. Debtor simply cannot sustain its burden to use cash collateral. See id. at 395 (observing that "since the equity holders and the general unsecured creditors are at the bottom of the 'totem pole' of priority of claims against the assets of the enterprise, it is often tempting for those junior interests to don rose-colored glasses in evaluating the prospects for future operations and reorganization"). In this case, Debtor's Motion to use the Cash Collateral simply places too great of a risk upon Lender without providing the requisite adequate protection to counter that risk.

WHEREFORE, Lender respectfully requests that the Court deny the Motion, and grant Lender such other and further relief as the Court deems just and proper.

This the 27th day of April, 2011.

/s/ Benjamin A. Kahn
Benjamin A. Kahn
N.C. State Bar No. 20004
NEXSEN PRUET, PLLC
701 Green Valley Road, Suite 100 (27408)
P.O. Box 3463
Greensboro, NC 27402
(336) 373-1600
bkahn@nexsenpruet.com

/s/ Julio E. Mendoza, Jr.
Julio E. Mendoza, Jr.
NEXSEN PRUET, LLC
1230 Main Street, Suite 700 (29201)
P.O. Drawer 2426
Columbia, SC 29202
(803) 540-2026
rmendoza@nexsenpruet.com

*Attorneys for Cape Fear Farm Credit, ACA, for Itself and as Agent/Nominee for Other Lending Institutions*

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

In re:                                    )
                                          )
CLEAN BURN FUELS, LLC,                    )    Case No. 11-80562
                                          )    Chapter 11
                                          )
            Debtor.                       )

## CERTIFICATE OF SERVICE

I certify that I have this date, served or caused to be served a copy of the foregoing **OBJECTION OF CAPE FEAR FARM CREDIT, ACA, FOR ITSELF AND AS AGENT/NOMINEE FOR OTHER LENDING INSTITUTIONS UNDER A CERTAIN CREDIT AGREEMENT, TO DEBTOR'S MOTION FOR AUTHORITY TO USE CASH COLLATERAL** by the Court's CM/ECF electronic service and/or by first class Mail, postage prepaid, on the following:

| | |
|---|---|
| John A. Northen<br>P.O. Box 2208<br>Chapel Hill, NC 27514-2208<br>*Attorney for Debtor* | Michael D. West<br>Bankruptcy Administrator<br>P.O. Box 1828<br>Greensboro, NC 27402 |
| Gregory Byrd Crampton<br>3700 Glenwood Avenue, Ste 500<br>Raleigh, NC 27612 | Vicki L. Parrott<br>P.O. Box 2208<br>Chapel Hill, NC 27514-2208 |
| Kevin Lamar Sink<br>P.O. Box 18237<br>Raleigh, NC 27619 | Paul A. Fanning<br>P.O. Box 8088<br>Greenville, NC 27835-8088 |
| James Pringle Laurie, III<br>Law Office of James P. Laurie III, PLLC<br>8311 Six Forks Road, Ste 111<br>Raleigh, NC 27615 | David M. Warren<br>Poyner Spruill LLP<br>P. O. Box 1801<br>Raleigh, NC 27602-1801 |
| Margaret R. Westbrook<br>4350 Lassiter at North Hills Ave, Ste 300<br>P.O. Box 17407<br>Raleigh, NC 2619-7047 | Gregory Byrd Crampton<br>3700 Glenwood Ave., Ste 500<br>Raleigh, NC 27612 |

This the 27th day of April, 2011.

        /s/ Benjamin A. Kahn
Benjamin A. Kahn
N.C. State Bar No. 20004