UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

In re:                                    )
                                          )
CLEAN BURN FUELS, LLC,                    )    Case No. 11-80562
                                          )    Chapter 11
                                          )
                  Debtor.                 )

## MOTION FOR RELIEF FROM STAY

NOW COMES Cape Fear Farm Credit, ACA, for itself and as agent/nominee for other lending institutions (collectively, "Lender") under a certain Credit Agreement with Clean Burn Fuels, LLC ("Debtor"), by and through counsel and pursuant to 11 U.S.C. §§ 361 and 362 and Bankruptcy Rules 4001 and 9014, and hereby moves for relief from stay with respect to substantially all of Debtor's real and personal property, tangible and intangible, including the Debtor's ethanol plant located in Hoke County, North Carolina and all related property, inventory, equipment and fixtures (collectively, the "Plant"), all funds on deposit in accounts Debtor has with Branch Banking & Trust Company, Capital Bank and Gateway Bank (the "Deposit Accounts") and two certificates of deposit at Capital Bank (the "Certificates of Deposit", and, collectively with the Deposit Accounts, the "Cash Collateral"). In support of this Motion, Lender respectfully shows unto the Court as follows:

### SUMMARY OF FACTUAL BACKGROUND

The facts in this matter are summarized as follows:

### A. The Secured Loans Made by Lender

1. On March 31, 2008, Debtor and Lender entered into that certain <u>Credit Agreement</u> (as amended, the "Credit Agreement") under which Lender agreed to make three term loans to Debtor in the aggregate original principal amount of $63,000,000.00 for, *inter alia*,

NPGVL1:602514.1

the construction of Debtor's ethanol plant, and to make a revolving line of credit loan to Debtor in the maximum principal amount of $6,000,000.00. In connection with these loans, the following documents (collectively, the "Loan Documents") were executed and, where appropriate for perfection of security interests and liens, filed with appropriate recording offices:

(a) <u>Credit Agreement</u> dated as of March 31, 2008 by and between Clean Burn Fuels, LLC, as Borrower (the "Debtor"), and Cape Fear Farm Credit, ACA, for itself and as agent/nominee for other lenders with an interest in the Loans (as defined therein), as Lender (the "Lender");

    (i) <u>First Amendment to Credit Agreement</u> entered into on November 11, 2008, by and between the Debtor and the Lender;

    (ii) <u>Second Amendment to Credit Agreement</u> entered into on March 4, <u>Third Amendment to Credit Agreement</u> entered into on June 26, 2009, by and between the Debtor and the Lender;

    (iii) <u>Fourth Amendment to Credit Agreement</u> entered into on December 3, 2009, by and between the Debtor and the Lender;

    (iv) <u>Fifth Amendment to Credit Agreement</u> entered into on April 26, 2010, by and between the Debtor and the Lender;

    (v) <u>Sixth Amendment to Credit Agreement</u> entered into on July 2, 2010, by and between the Debtor and Lender;

    (vi) <u>Seventh Amendment to Credit Agreement</u> entered into on October 29, 2010, by and between the Debtor and the Lender;

(b) <u>Construction/Term Loan Note</u> dated March 31, 2008 from the Debtor to the Lender, for Loan Number 020-090-743450-01, in the original principal amount of $25,000,000.00;

    (i) <u>Construction/Term Loan Note Modification Agreement No. 1</u> dated April 26, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-01, in the original principal amount of $25,000,000.00;

2
NPGVL1:602514.1
Case 11-80562    Doc 153    Filed 06/10/11    Page 2 of 15

(ii) Construction/Term Loan Note Modification Agreement No. 2 dated October 29, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-01, in the original principal amount of $25,000,000.00;

(c) Construction/Term Loan Note dated March 31, 2008 from the Debtor to the Lender, for Loan Number 020-090-743450-02, in the original principal amount of $10,000,000.00;

(i) Construction/Term Loan Note Modification Agreement No. 1 dated April 26, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-02 in the original principal amount of $10,000,000.00;

(ii) Construction/Term Loan Note Modification Agreement No. 2 dated October 29, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-02 in the original principal amount of $10,000,000.00;

(d) Construction/Term Loan Note dated March 31, 2008 from the Debtor to the Lender, for Loan Number 020-090-743450-03, in the original principal amount of $28,000,000.00;

(i) Construction/Term Loan Note Modification Agreement No. 1 dated April 26, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-03 in the original principal amount of $28,000,000.00;

(ii) Construction/Term Loan Note Modification Agreement No. 2 dated October 29, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-03 in the original principal amount of $28,000,000.00;

(e) RLOC Note dated March 31, 2008 from the Debtor to Lender, for Loan Number 020-090-743450-04, in the original principal amount of $6,000,000.00;

(i) RLOC Note Modification Agreement No. 1 dated April 26, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-04 in the original principal amount of $6,000,000.00;

(ii) RLOC Note Modification Agreement No. 2 dated October 29, 2010 by and between the Debtor and the Lender, for Loan Number 020-090-743450-04 in the original principal amount of $6,000,000.00;

(f) Deed of Trust, Security Agreement and Assignment of Leases, Rents and Occupancy Agreements dated March 31, 2008 from the Debtor in favor of Lender, filed

with the Hoke County, North Carolina Register of Deeds on March 31, 2008 in Book 801 at pages 287-303, designated on such filing as Instrument # 02111;

(g) Security Agreement dated March 31, 2008 by and between the Debtor and Lender;

(h) UCC-1 Financing Statement filed by Lender with the North Carolina Secretary of State on April 9, 2008, designated on such filing as File No. 20080033438B;

(i) UCC-1 Financing Statement filed by Lender with the Hoke County, North Carolina Register of Deeds on March 31, 2008, in Book 801 at pages 304-309, designated in such filing as Instrument # 02112;

(j) Assignment of Construction Documents dated March 31, 2008 from the Debtor in favor of Lender;

(k) Subordination and Standstill Agreement dated as of November 15, 2008, by and between Lender, as the Lender under certain loans to the Debtor, and Clifford E. Bullard, Jr., Philip Kohl, George M. Brannon, Lee-Moore Capital Company (by Kirk J. Bradley, its President), Greg Brown and Jack Carlisle, and acknowledged by the Debtor;

(l) Contractor Guaranty and Reimbursement Agreement entered into and effective on July 2, 2010, by and among Jack J. Carlisle, Lender, and the Debtor;

(m) Limited Guaranty dated April 23, 2010 by and among Capitol Broadcasting Company, Inc., as Guarantor, the Lender, and the Debtor;

(n) Limited Guaranty dated April 26, 2010 by and among Lee-Moore Capital Company, as Guarantor, the Lender, and the Debtor;

(o) Limited Guaranty dated April 26, 2010 by and among Jack J. Carlisle, as Guarantor, the Lender, and the Debtor;

(p) <u>Limited Guaranty</u> dated April 26, 2010 by and among Anna Ho, as Guarantor, the Lender, and the Debtor; and

(q) <u>Limited Guaranty</u> dated April 26, 2010 by and among Phillip H. Kohl, as Guarantor, the Lender, and the Debtor;

2. Pursuant to the Credit Agreement, the Deed of Trust, Security Agreement and Assignment of Leases, Rents and Occupancy Agreements, and the Security Agreement, Debtor granted to Lender a security interest in, assignment of and lien on all, or substantially all, of Debtor's assets. The security interests and liens were perfected by recordation of the Deed of Trust, Security Agreement and Assignment of Leases, Rents and Occupancy Agreements with the Hoke County, North Carolina Register of Deeds, and by the filing of the UCC Financing Statements with the North Carolina Secretary of State and with the Hoke County, North Carolina Register of Deeds.

3. Among other items and types of property as set forth in the Loan Documents as defined below, Lender's security interest and lien covers the Plant, all funds and proceeds of Lender's collateral, including those funds in the Deposit Accounts, all funds in the hand of third parties traceable to Lender's collateral, all other Cash Collateral, all inventory, accounts receivable and general intangibles, all collateral granted to Lender in the Cash Collateral Orders as defined below, and the proceeds of any of them (and of all other collateral securing Lender) (collectively, the "Collateral").

4. Debtor defaulted under the terms of the Credit Agreement and the Loan Documents, and on March 10, 2011, Lender provided notice of the default to Debtor in accordance with the provisions of the Loan Documents.

5
NPGVL1:602514.1
Case 11-80562   Doc 153   Filed 06/10/11   Page 5 of 15

5. The aggregate principal balance due under the two Construction/Term Notes is $62,160,247.00, and the principal balance due under the RLOC Note is $3,660,000.00. The aggregate principal amount owed under all three loans is $65,820,247.00.

6. Lender is informed and believes that the funds in the Deposit Accounts consist solely of proceeds of Lender's collateral, such as collected accounts receivable and/or sale proceeds of inventory securing Lender. Accordingly, Lender is informed and believes that it possesses a perfected security interest in all of the Cash Collateral.

### B. Background of the Plant

7. Debtor's principal asset is a dry corn-to-ethanol plant located just outside of Raeford, North Carolina. The Plant was designed to produce 166,000 gallons of ethanol per day. This level of production is referred to as the "Nameplate."

8. The Plant has encountered significant, repeated, and unusual delays in its construction and development. While it is not uncommon to have delays in the construction and development of ethanol plants, it is uncommon for such delays to take more than 90 days after the initial date for scheduled full production. As of the date of this objection, the Plant has been in start-up for over 250 days, and Debtor now is in the process of idling the facility with no concept for how Debtor might choose to move forward, if at all. In fact, Debtor does not know whether it will attempt a sale of the Plant, attempt to re-start the Plant and reorganize, abandon the Plant to the Lender, or take some other as yet unarticulated course.

9. The Plant first ground corn on August 13, 2010. Since that time, Debtor has unsuccessfully attempted to reach Nameplate. Debtor reported to Lender that it reached Nameplate for approximately three (3) days, but then a burner failure in the dryers caused one of the dryers to shut down and limit production. These issues with the dryers are ongoing, more

severe than dryer issues at other plants, and Debtor has not identified any solution, nor has it determined any source of funding to replace the dryers that Lender understands Debtor now contends are defective.

10. The dryers are not the only problems preventing the Debtor from reaching Nameplate and fully permitted operations. In addition to the problems with the dryers, the Plant has encountered the following deficiencies:

  (a) Safety Issues. Debtor was delayed in installing proper safety equipment in areas where chemicals are stored. Debtor has resolved some of these issues, but Lender is informed and believes that there are remaining safety issues to be addressed to comply with OSHA requirements.

  (b) Grain Bins. The grain silos experienced settling, which caused the foundations to crack. Debtor has attempted a repair on the west silo, and is in the process of determining the success of that repair. Unfortunately, there has been some evidence of further minor settling after the repair. The repairs on the east silo have been postponed pending the results of the attempted repair on the west silo.

  (c) Pump Seals. A number of pump seals have failed, causing a number of leaks around the plant. It is unusual for a plant to have as many severe pump seal issues as have occurred at the Plant.

  (d) Contact Water. The leaks from the pump seals could cause a potential violation of the Plant's NPDES waste water discharge permit.

  (e) Inadequate Boiler Capacity. The Debtor intends to have discussions with a boiler consultant, and has listed an expense of $600,000 under capital expenditures in its estimated budget for an additional boiler. Even if the Plant were to re-start, inadequate boiler capacity likely would limit the plant's capability to continuously operate at nameplate due to the requirement to run the boilers continuously at maximum load.

  (f) Fermentation Wash Tank and CIP Tank Collapse. The Fermentation Wash Tank and CIP Tank for the Plant collapsed, caused by the lack of a relief valve on the top of the tank and potentially also partially by faulty operation of the plant by personnel. Debtor has indicated that it only can use these tanks on a very limited basis due to the damages.

  (g) Emissions Testing. The Plant attained First Grind on August 13, 2010. Debtor has 180 days from initial operation to successfully complete testing to show compliance with the Air Permit. The Plant has not met

Nameplate, and now has been placed in idle mode.  Lender is informed by Debtor that NCDENR has extended the testing deadline by 90 days.  The shut down will cause this period to be exceeded.

(h) <u>Boiler Explosion</u>.  On November 16, 2010, Debtor reported that it had experienced an explosion in one of the boilers on November 4, 2010.  The cause of the explosion still is unknown.  While Debtor has suggested a cause, the true cause has not been determined.

(i) <u>Spare Parts</u>.  Debtor has a significant shortage of spare parts to ensure operations.

11. Debtor has conceded to this Court at the initial hearing on Cash Collateral that the Plant cannot be profitable if the price of corn does not return to previous levels, a commodity speculation that is highly unlikely under the current market forecasts.

12. Debtor stopped both purchasing corn and the production of products, shutting down its plant, in or about late February, 2011, as set forth in the Motion.  Since that time, Debtor has been transitioning the plant to an "idle" state, which is virtually complete.

13. Given that Debtor has not been purchasing corn or producing new product since late February 2011, Debtor has not been replenishing its inventory, and as it has used, and now proposes to use, the funds it has collected from accounts receivable, Debtor has been diminishing the collateral securing Lender.  Debtor's further continued use of the proceeds of Lender's collateral in any amounts greater than that necessary to preserve the assets during an orderly surrender of the Plant to Lender would further diminish Lender's collateral and secured position.

14. On April 8, 2011, May 11, 2011, and May 16, 2011, the Court entered various Orders authorizing Debtor's interim use of Cash Collateral.  On June 2, 2011, the Court further authorized Debtor to use Cash Collateral through and including June 19, 2011.  Collectively, the April 8, May 11, and May 16 Interim Orders and any further Order entered by the Court pursuant to its ruling on June 2, 2011, shall be referred to herein as the "Cash Collateral Orders."

8
NPGVL1:602514.1
Case 11-80562    Doc 153    Filed 06/10/11    Page 8 of 15

## BASES FOR RELIEF FROM STAY

The court may grant relief from the automatic stay. Section 362(d) authorizes the Court to grant relief from the automatic stay, and provides in relevant part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay --
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if –
>
> > (A) the debtor does not have any equity in the property; and
> > (B) such property is not necessary for an effective reorganization .
> > . . .

11 U.S.C. § 362(d).

"Cause" under § 362(d)(1) is not defined in the Bankruptcy Code. "'Cause' has no clear definition and is determined on a case-by-case basis." In re Conejo Enterprises, Inc., 96 F.3d 346, 352 (9th Cir. 1996) (citations omitted). "In determining whether cause exists, the bankruptcy court should base its decision on the hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code." In re C&S Grain Co., Inc., 47 F.3d 233, 238 (7th Cir. 1995). While "cause" is not defined, one of the enumerated bases for cause is lack of adequate protection of the creditor's interest in its collateral. 11 U.S.C. § 362(d)(1). The creditor's interest in its collateral is not adequately protected where the collateral continues to decline in value, or there is the legitimate risk that the collateral will further decline in value. United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd., 108 S.Ct. 626, 630 (1988).

The Bankruptcy Code imposes separate burdens of proof with respect to motions for relief from stay. "In a hearing . . . concerning relief from the stay . . . the party requesting such relief has the burden of proof on the issue of the debtor's equity in the property; and . . . the party opposing such relief has the burden of proof on all other issues." 11 U.S.C. § 362(g). Therefore, while the Courts require the movant initially to articulate some prima facie basis for "cause," thereafter, the ultimate burden lies with the debtor to prove the absence of "cause." See In re Abdul Muhaiman, 343 B.R. 159, 169-170 (Bankr. D. Md. 2006) ("The party seeking relief from the automatic stay has an initial burden of going forward with the evidence to establish *prima facie* cause for relief; but the burden of proof, i.e. the burden of persuasion, then shifts to the party opposing relief on all issues, except the existence of equity. This burden of persuasion may also be viewed as the risk of non-persuasion." [internal citations omitted].); In re Highcrest Management Co., Inc., 30 B.R. 776, 778 (Bankr. S.D.N.Y. 1983) (where the debtor rests without presenting any evidence as to cause, the debtor has failed to carry its burden, and the stay should be modified); and In re Gauwin, 24 B.R. 578, 580 (9th Cir. BAP 1982) (the debtor has the burden to show the absence of cause).

Without limitation, Lender is entitled to relief from stay upon the following bases:

**A.** **Debtor cannot provide adequate protection or the indubitable equivalent of any of Lender's Collateral and Lender's Collateral continues to decline in value.**

Lender is not adequately protected for its interest in any of the Collateral or as a secured creditor, and Debtor's proposed use of the Cash Collateral would cause Lender to suffer loss and a diminution of its collateral.

Prior to placing the plant in idle, Debtor stated that it was operating at a loss of approximately $1.5 million per month. Therefore, even if the Debtor were able to re-start the Plant, past performance and the economic realities of the market would indicate that operations

only will cause further losses to Lender and the estate. In addition, there is great risk that leaving the Plant idle will cause significant damages, and there is certainty that re-starting the Plant will require significant cash resources which the Debtor does not have without expending Lender's Cash Collateral.

While it is clear that Debtor carries the burden in demonstrating adequate protection, the cases are mixed on the standard of proof that the Debtor must meet. Compare, In re O.P. Held, Inc., 74 B.R. 777, 784 (Bankr. N.D.N.Y. 1987) (stating that "[w]hen requesting Court authorization for expenditure of cash collateral, a debtor must prove by clear and convincing evidence that the secured creditor will realize the value of its bargain in light of all the facts and circumstances of the case"); with In re Goode, 235 B.R. 584, 589 (Bankr. E.D. Tex. 1999) ("Thus, it becomes incumbent upon the Debtor in this case to prove by a preponderance of the evidence, as a prerequisite to its use of CNB's cash collateral, that CNB's interests are adequately protected."). Nevertheless, it does not matter which standard is applied in this case because Debtor cannot meet either.

Debtor's sole basis at the inception of this case for asserting adequate protection was that it believed that there may be equity in the plant based upon an admittedly out of date estimate of value, and which value was premised upon a permitted plant operating at Nameplate production. In contrast, this plant is not producing, and has never consistently produced, at Nameplate, never has obtained the requisite permits for full operations, and faces many expensive and significant issues with respect to such permitting.

### B. There is no equity in the Collateral.

While no party to this case is certain as to the value of the Plant and the remaining Collateral, it is beyond dispute at this point that there currently is no equity in the Collateral for the Debtor or its estate.

11
NPGVL1:602514.1
Case 11-80562   Doc 153   Filed 06/10/11   Page 11 of 15

**C.** **The budget projections, Debtor's lack of any idea how it might move forward without significant reliance upon unsupported commodity speculation, and the significant pre-petition operating losses all demonstrate that Debtor cannot propose a successful reorganization.**

Since Debtor cannot operate without substantial, continuing losses going forward unless there is a significant and unlikely change in circumstances, there is no projection demonstrating that Debtor will be able: (i) to confirm a plan in the face of the lien of Lender; (ii) comply with its obligation to make some debt service (which is not included in the budget); (iii) to cover the operating obligations and the costs of administration of a Chapter 11 case, and any further obligations of the business. While the debtor may get <u>some</u> benefit of the doubt at the beginning of a case, "when the debtor seeks usage of cash collateral, it is appropriate for the Bankruptcy Court to determine, even at the earliest stages of the case, whether there is any chance for a successful reorganization." 4 WILLIAM L. NORTON, JR., NORTON BANKRUPTCY LAW AND PRACTICE § 87:13, at n.27 (2nd ed. 2003). In fact, Debtor has conceded to this Court at the initial hearing on Cash Collateral that the Plant cannot be profitable if the price of corn does not return to previous levels, a commodity speculation that is highly unlikely under the current market forecasts.

**D.** **Debtor cannot use hopes of future profitability as adequate protection.**

Debtor has never made a profit from operations, and, in fact, has operated at significant losses. Debtor cannot successfully contend that its future profits will provide adequate protection – especially where Debtor never has operated at any profit, and there is significant doubt that Debtor ever will operate at all. Operational profitability coupled with replacement liens in a revolving collateral pool will provide adequate protection in certain circumstances, provided that the Debtor (i) is able to demonstrate that such profitability can be sustained over the long term, (ii) is supported by realistic projections, and (iii) has some room for margin,

whether by equity cushion or otherwise.  E.g., In re Dynaco Corporation, 162 B.R. 389, 392-99 (Bankr. D.N.H. 1993).  However, Debtor cannot meet any of these requirements.

In this case, Debtor concedes that, even if Debtor were operating, it would be operating at a loss.  Since Debtor no longer is operating, Debtor has no margin whatsoever and no equity cushion with a non-operating, incomplete, and defective Plant.  Debtor simply cannot sustain its burden to show any realistic possibility of a successful reorganization.  See id. at 395 (observing that "since the equity holders and the general unsecured creditors are at the bottom of the 'totem pole' of priority of claims against the assets of the enterprise, it is often tempting for those junior interests to don rose-colored glasses in evaluating the prospects for future operations and reorganization").

The Debtor has neither the expertise nor track record of correcting the litany of mechanical and operational deficiencies of the plant. The Lender is the sole party in interest with the ability and resources to remedy the issues pertaining to its Collateral and fairly seeks to do so without the ongoing expense of this bankruptcy proceeding.

WHEREFORE, Lender respectfully requests that the Court:

1. Modify the automatic stay to permit the Lender to exercise its rights against all the Collateral under the Loan Documents and non-bankruptcy law; and

2. Grant Lender such other and further relief as the Court deems just and proper.

13
NPGVL1:602514.1
Case 11-80562    Doc 153    Filed 06/10/11    Page 13 of 15

This the 10th day of June, 2011.

/s/ Benjamin A. Kahn
Benjamin A. Kahn
N.C. State Bar No. 20004
NEXSEN PRUET, PLLC
701 Green Valley Road, Suite 100 (27408)
P.O. Box 3463
Greensboro, NC 27402
(336) 373-1600
bkahn@nexsenpruet.com


/s/ Julio E. Mendoza, Jr.
Julio E. Mendoza, Jr.
NEXSEN PRUET, LLC
1230 Main Street, Suite 700 (29201)
P.O. Drawer 2426
Columbia, SC 29202
(803) 540-2026
rmendoza@nexsenpruet.com

*Attorneys for Cape Fear Farm Credit, ACA, for Itself and as Agent/Nominee for Other Lending Institutions*

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

In re: )
)
CLEAN BURN FUELS, LLC, ) Case No. 11-80562
) Chapter 11
Debtor. )

**CERTIFICATE OF SERVICE**

  I certify that I have this date, served or caused to be served a copy of the foregoing **MOTION FOR RELIEF FROM STAY** by the Court's CM/ECF electronic service and/or by first class Mail, postage prepaid, on the following:

| | |
|---|---|
| John A. Northen<br>P.O. Box 2208<br>Chapel Hill, NC 27514-2208<br>*Attorney for Debtor* | Michael D. West<br>Bankruptcy Administrator<br>P.O. Box 1828<br>Greensboro, NC 27402 |
| Gregory Byrd Crampton<br>3700 Glenwood Avenue, Ste 500<br>Raleigh, NC 27612 | Vicki L. Parrott<br>P.O. Box 2208<br>Chapel Hill, NC 27514-2208 |
| Kevin Lamar Sink<br>P.O. Box 18237<br>Raleigh, NC 27619 | Paul A. Fanning<br>P.O. Box 8088<br>Greenville, NC 27835-8088 |
| James Pringle Laurie, III<br>Law Office of James P. Laurie III, PLLC<br>8311 Six Forks Road, Ste 111<br>Raleigh, NC 27615 | David M. Warren<br>Poyner Spruill LLP<br>P. O. Box 1801<br>Raleigh, NC 27602-1801 |
| Margaret R. Westbrook<br>4350 Lassiter at North Hills Ave, Ste 300<br>P.O. Box 17407<br>Raleigh, NC 2619-7047 | Gregory Byrd Crampton<br>3700 Glenwood Ave., Ste 500<br>Raleigh, NC 27612 |

  This the 10th day of June, 2011.

               /s/ Benjamin A. Kahn
               Benjamin A. Kahn
               N.C. State Bar No. 20004